WILLIAM H. MYERS ET AL *v.* AMOS V. COLEMAN.

[46 South. 249.]

BROKERS. *Contract. Commissions. Unilateral agreement. Sale of homestead.*

> Where brokers, at the instance of their customer, induced the owner of a homestead to verbally agree to sell his home to the customer, and afterwards secured from him a unilateral written contract agreeing to sell to the customer for a designated sum "less five per centum commissions," the brokers cannot recover commissions of the owner, the sale having failed because the owner's wife would not join in the execution of a deed.

FROM the circuit court of Clay county.

HON. J. T. DUNN, Judge.

Myers and another, brokers, doing business under the co-partnership name of Myers & King, appellants, were plaintiffs in the court below; Coleman, appellee, was defendant there. From a judgment in defendant's favor the plaintiffs appealed to the supreme court. The facts are fully stated in the opinion of the court.

*F. G. Barry,* for appellants.

Coleman made a contract with appellants, real estate brokers, agreeing to pay a stipulated commission to them if they should sell Coleman's land. The sale was affected, and appellee and appellants reduced the terms and commissions, viz, five per cent, to writing, stating the amount of the purchase money, to-wit, $1,700, and the name of the vendee, W. Rutlidge, and that the land was deliverable, or possession thereof to be given on or before November 1st, 1906.

This instrument is brief, perhaps should have been fuller, but the testimony of appellants explain it amply; but nowhere does it seek to add to or alter the same.

The time arrived for the fulfilment of his contract but appellee deliberately breached it—changed his mind; the appellants, having faithfully done all required of them up to that time and were able and anxious to complete and consummate the sale.

The law is familiar giving and measuring appellants' damages, but I beg to refer the court to the cases of *Stokes v. Clay County Oil Mill,* 33 South. 283, and *White v. Leatherberry,* 82 Miss. 103, 34 South. 358.

The question is, what would have appellants made as commission if Coleman had carried out his contract? The stipulated sum of course. Granting for the sake of argument, that Rutlidge had to pay this commission, what kept him from paying it? Why, the failure of Coleman to carry out his agreement. Even in that view appellee is liable. It is not specula-

tive, from that point of view, but is what appellants would have made in ordinary course of business had Coleman kept his promise. Whether the profits accruing to appellants would have immediately or ultimately come out of Rutlidge's pocket or appellee's is wholly beside the question.

But the evidence shows it would come out of the $1,700 going to Coleman which Rutlidge was willing and anxious to pay, but Coleman would not let him have the land. And in the face of that, to say appellants must look to Rutlidge for the five per cent commission ignores every fact in the case and the plainest principles of law and reason.

*Fox & McClellan,* for appellees.

The claim of plaintiffs is denied and the suit is defended for several reasons.

1st. On the ground that plaintiffs, in attempting to negotiate the sale, acted as the agent of plaintiffs and not of the defendants.

2nd. There was not any agreement on the part of Coleman to pay the commission, and never any services rendered to him as a consideration for the commission.

3rd. As appears from the testimony of Myers, one of the plaintiffs, the land was to be sold for $1,700 cash.

4th. As appears from the contract for the sale of the land between Coleman and Rutledge, Rutledge was only to pay $1,700 less five per cent commission, from which the conclusion is irresistible that Rutledge was to pay his agents, Myers & King, the five per cent commission.

5th. From all the testimony in the case, it is shown that the sixty acres agreed to be sold was a homestead, and the wife not signing, the contract was void.

6th. There never was any money tendered to Coleman in performance of the contract. Rutledge went to the office of Myers, looking for a home; Myers asked him what kind of a farm he wanted and what he would like; Rutledge told Myers what he

wanted, and Myers told him he thought he knew a place that would suit him, but didn't know whether he could get it or not, but would see. The next day he went to the northern part of the town and met Coleman and asked him if he wouldn't like to sell his place, and asked him if he could get $1,700 for his place would he take it, and Coleman answered he would. "Then," said Myers, "I will come out to-morrow morning with my man and show him the place." He took him out there and he looked over the place, and Rutledge was satisfied; not one word was said, and not one act was done by Myers & King, indicating that they were acting at the instance or suggestion of Coleman as his agents. Everything said and done shows clearly that whatever services they rendered were rendered to Rutledge; not one word was ever said about commissions.

This was about the 1st of September. After it was all over Myers told Coleman that he thought that they had better have "a little writing to show the sale." That little writing was drawn up and signed by Coleman. It was not a contract for the payment of commissions, but it "witnesseth" that Coleman had that day sold his land to Rutledge, the deed to be delivered on or before November 1, 1906, for $1,700, less five per cent commission. Rutledge was to pay $1,700 in all. Therefore, as he only agreed to pay Coleman $1,700 less the commission, we must conclude that the commission was to be paid to Myers & King by Rutledge. It was not a contract between Myers & King and Coleman, but a contract between Coleman and Rutledge, Myers & King acting at the time as the agents of Rutledge.

7th. It will be seen from the testimony of Myers that everything he did as a real estate agent was at the instance of Rutledge and nothing he did was at the suggestion or instance of the appellee.

Calhoon, J., delivered the opinion of the court.

This is an action by appellants to recover $85 of commissions from Coleman which they aver he owes them for the sale of cer-

tain land of his at the price of $1,700; their commissions being five per cent of the amount of the sale.

It is shown by the testimony of the appellants themselves as witnesses that the following are the facts: The written contract itself is without date, but was made after the sale is alleged to have been made. The alleged sale occurred on some day between the 1st and the 10th of September, 1906, and the contract on which recovery is sought to be had is in the following words, some time subsequently made:

"Witnesseth that A. V. Coleman has this day sold to W. T. Rutledge 60 acres off the south side of N. W. ¼ of section 25—16—7 on or before November 1st, 1906, at $1,700.00 less five perct. com. [Signed] A. V. Coleman."

This is all of it and just as produced—nobody bound but Coleman—unilateral. This written contract, Myers testifies, was made after the sale, and he states that, in September, Rutlidge came to his office from Indiana and was looking up a site for a home. Myers told him that he knew of a place he thought would suit him if he could get it. He was referring to this place of Coleman's. Myers testifies that, having occasion to go into Coleman's neighborhood, on that same day he "ran across" Coleman and asked him if he would sell the land, and he said "Yes," and when asked what he would take for it, finally said that he would take $1,700 for the place. Accordingly, Myers took Rutlige and his wife to the place, and Rutlidge expressed himself as very well satisfied, as did Mrs. Rutlidge, and so Myers told Coleman, who promised to come over to town the next day or the day after the next. Myers testifies that Coleman did come over, and that he told him that he had sold his place, and he said it was all right, and the contract hereinbefore shown was written and signed; Myers telling him that: "We had better have a little writing to show the sale." And Myers says he told him that Rultidge and his wife had gone back home, meaning to Indiana. It is nowhere suggested that, beyond the signing of the contract, Coleman ever promised to pay any com-

missions, and it is plain that Myers & King were, up to that time, acting purely and simply as the agents of Rutlidge, who wanted to buy the property. Myers further testifies that, about two weeks after that contract was signed, Coleman came to his office and said: "This sale is cash, I suppose." To which Myers answered: "Certainly." And then Myers said to Coleman: "The parties are expecting to want to do some improvements, and he didn't say anything against it." Subsequently after Myers & King had received a letter from Rutlidge, Myers or King spoke to Coleman in regard to improvements, and the witness says: "There he (meaning Coleman) kicked out of harness entirely." And then Coleman said that his wife would not sign the deed, and he could not sell it. Myers testifies that he believes Rutlidge was prepared and willing to carry out his contract. No money was ever tendered to Coleman. There is no other evidence showing that Rutlidge was willing to pay the cash and carry out the contract, except that Myers supposes he would.

King testifies that, a week or ten days after Rutlidge had gone home to Indiana, he told Coleman that a letter from Rutlidge said that he wanted to make some improvements on the place before his family came South, to which Coleman answered that he didn't know whether he wanted the improvements on it or not, and King told him it wouldn't do any harm to improve the place, and Coleman then said: " 'Well you know this place was sold for cash,' and I said, 'Yes, I know it was sold for cash. The contract will be completed so far as the money is concerned.' " And King testifies that, about a week after that, Coleman came to the office and seemed indifferent about the sale, and finally said: "I don't believe I want to sell it." King then told him that his firm would make him sell it. He testifies further, thus: "Q. State whether you were ready and able to carry out your part of the contract for the amount of $1,700? A. Yes, sir." And further he told Coleman that it was a cash transaction, and that whenever Coleman was ready to make the deed,

which was not to be later than the 1st of November, which gave him time to get his crop off, the firm of Myers & King would be ready to pay him his money; and King testifies that on the 1st of November his firm was ready to pay him the money.

The land to be sold was Coleman's homestead on which he and his wife lived. There was never any demand for deed or tender to Coleman of the purchase price of the land. Five per cent of the amount of the sale price was the usual commission to be charged, as is shown by the testimony. Outside of the written unilateral contract, there was never any reference to commissions in any conversation, and, unless that contract shows it, there was no obligation on the part of Coleman to pay any commissions whatever. It seems to us, on the facts, that the services were rendered to Rutlidge, and not to Coleman. Coleman was quiescent. He was approached by the brokers to know if he would sell, and he signed the written contract, which imports at most that he would accept $1,700, less five per cent commission, and so it appears that Rutlidge, if anybody, was to pay the commissions to the brokers. It appears that no money was tendered to Coleman although the transaction was to be for cash. It also seems to us that there was a change in the offer of Myers & King, for their customer, Rutlidge, in that Rutlidge wanted to put improvements on the place while Coleman occupied it. On the facts there is no liability.

*Affirmed.*